## THE QUEENSMORE.

### MYERS et al. v. THE QUEENSMORE.

(Circuit Court of Appeals, Fourth Circuit. February 7, 1893.)

### No. 32.

1. SHIPPING—FREIGHT—SHIPPER'S CONTRACT—GUARANTY.
  A contract for the shipment of cattle guarantied the payment of freight by the shippers, whether or not the cattle were "lost in any manner whatsoever," and also provided that the freight should be payable on the arrival of the ship at Liverpool. *Held*, that the latter provision did not relieve the shippers from liability on their absolute guaranty, though the cattle were lost through fire and subsequent wreck of the vessel, which failed to reach its port of destination.

2. SAME—BILL OF LADING.
  Such liability was not affected by any question as to whether the bill of lading providing, "Freight payable, ship lost or not lost," was or was not in harmony with the shipping contract.

Appeal from the District Court of the United States for the District of Maryland.

In Admiralty. Libel to recover freight. Decree for libelants. 51 Fed. Rep. 250. Respondents appeal. Affirmed.

Thomas W. Hall, for appellants.
Arthur George Brown and Frederick Brune, for appellee.

Before GOFF, Circuit Judge, and HUGHES and SIMONTON, District Judges.

HUGHES, District Judge. This suit relates to a shipment of 517 cattle from Baltimore for Liverpool, in October, 1889, on the British steamship Queensmore. The shipment was made under the provisions of a general contract entered into July 12, 1889, between Myers & Houseman, cattle shippers of Baltimore, and the

agents of the Johnston Line of ocean steamers, of which the Queensmore was one. Among the provisions of this general contract is the following clause:

"The freight is payable upon said cattle at the rate of eighty shillings British sterling per head on the number shipped at Baltimore, whether delivered alive or not delivered at all, and is payable in Liverpool on the arrival of the steamships."

According to the custom of merchants the general contract was signed only by the shippers, Myers & Houseman, and the bills of lading delivered under it only by Patterson, Ramsay & Co., agents of the ship. The contract of July contemplates the delivery of such bills of lading. There were two parcels of cattle, and two bills of lading identical in terms. Another provision of the general contract of July was that the ship should be "free from all responsibility for mortality or accident of any kind to the cattle, or any of them; and if any of them die, or are thrown overboard or are washed overboard, or are lost in any manner whatsoever, the freight is nevertheless to be paid, and is hereby guarantied to be paid, by the shippers,"—nothing being said in this clause limiting the liability of the shippers to payment only upon the arrival of the ship in Liverpool. A clause in the bill of lading signed by agents of the ship is similar to the foregoing, except that it relates to the loss of the ship. It provides that "freight is payable, ship lost or not, upon the number of animals embarked, without regard to and irrespective of the number landed; and the shippers hereby guaranty payment of such freight if not paid by consignees."

The steamer sailed from Baltimore on the 27th of October, 1889, with a large quantity of compressed cotton and other general merchandise on board, and with nearly a thousand cattle on the decks, the 517 shipped by Myers & Houseman being included. A few days after the ship got out to sea, fire was discovered in the cotton. It is not charged that this accident or any subsequent misfortune that befell the ship was due to negligence of those in charge of her. Every effort was made to extinguish the fire, to protect and preserve the cattle, and save the ship, but in vain. The cattle were suffocated or necessarily thrown overboard, only eight or ten in the bow being saved. Five days after the fire had been in progress, and after the ship, in consequence of the burning of her machinery, had become unmanageable, the ship herself was lost, and became a total wreck, from having struck a rock on the southwest coast of Ireland. The libelants claim the freight as due on the cattle, under the terms of the general contract and on the bill of lading, making them due, "ship lost or not lost."

Action for the freight was brought in the district court of the United States for Maryland, sitting in admiralty, by which a decree was rendered in favor of the libelants for $10,172.43, the amount claimed. This appeal is from that decree. No other question was raised in the court below, or is presented here, but the simple one whether the clause which has been quoted from the general contract of July, 1889, providing that the freight should be "payable in Liverpool on the arrival" of the ship there, releases the ship-

pers from liability for the freight, in consequence of the loss of the ship at sea and nonarrival at Liverpool. On the contrary, the liability is virtually admitted to exist, but for this language in the contract. If there was no other clause in the respondents' contract of July 12, 1889, except that making the freight payable on the arrival of the ship at Liverpool, there might be some difficulty in holding respondents liable under it. By that contract the freight was not made payable at Baltimore by the shippers, but was made payable at Liverpool by the consignees; and the shippers gave an absolute guaranty that it should be paid, the guaranty being limited by no condition of arrival at the port of destination. In this suit it is not the consignees in Liverpool that are sued, under their obligation as such, for it may be easily conceived that they are under no obligation in respect to cattle that never "arrived at Liverpool" or came into their custody; but it is the shippers who are sued on their guaranty of the freight—a guaranty absolute and unlimited in its terms, that the freight should be paid whether the cattle should die, or be thrown overboard or washed overboard, or lost in any manner whatever. That guaranty of the shippers is absolute and unlimited in its terms, and cannot be construed to depend upon a clause relating to payment in Liverpool by consignees, who would, as merchants, be bound to pay only when the cattle should come into their hands. This latter clause contemplates the arrival of the ship, and the obligation of the consignees in that contingency. The preceding clause contemplates the loss of the cattle at sea, and the obligation of the shippers in that contingency. It is the guarantying clause that we are called upon to deal with, and not the other. We think the shippers are liable on their guaranty for the freight.

It is useless to discuss the effect of the clause in the bill of lading providing that "freight is payable, ship lost or not lost, upon the number of animals embarked." As already shown, the general contract signed by the shippers fixes their liability, without reference to the loss of the ship; and this liability cannot be affected by the question whether the clause, "ship lost or not lost," in the bill of lading, was or was not in harmony with the general contract of July, and binding. The decree below is affirmed.